UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,                              Criminal No. 10-275 (MJD/FLN)

        Plaintiff,

    v.                                                        **REPORT AND**
                                                          **RECOMMENDATION**

**01- Noel Gutierrez Manzanares,**
**02- Robert Garcia,**
**03- Karl James Pentz,**
**04- Randy Lee Motzko,**

        Defendants.
_____

Christian S. Wilton, Assistant United States Attorney, for Plaintiff.
Thomas H. Shiah for Defendant Manzanares.
Barry V. Voss for Defendant Garcia.
Shannon R. Elkins for Defendant Pentz.
Andrea K. George for Defendant Motzko.
_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on December 15, 2010 on Defendant Manzanares' Motion to Suppress Evidence of Electronic Surveillance and Wiretapping (ECF No. 51), Defendant Garcia's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. 72), Defendant Garcia's Motion to Suppress the Contents of Any Intercepted Wire or Oral Communications and Derivative Evidence (ECF No. 100), Defendant Pentz' Motion to Suppress Government Interception of Wire or Oral Communications (ECF No. 84), Defendant Pentz' Motion to Suppress Search and Seizure (ECF No. 92), Defendant Pentz' Motion to Suppress Statements Made by Defendant (ECF No. 94), Defendant Motzko's Pretrial Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. 97), and Defendant

1

Motzko's Pretrial Motion to Suppress Statements, Admissions, and Answers (ECF No. 98). At the

hearing, the Court received testimony from Special Agent Jayme Syversen, Deputy Patrick Pickar,

and Agent Jeremy Leese. The Government submitted eleven exhibits into evidence.[1]

The matter was referred to the undersigned for Report and Recommendation pursuant to 28

U.S.C. § 636 and Local Rule 72.1. For the reasons which follow, the Court recommends

Defendants' suppression motions be **DENIED**.

## I. FINDINGS OF FACT

### A. Electronic Surveillance

On April 26, 2010, Assistant United States Attorney Chris S. Wilton applied for an Order

Authorizing the Interception of Wire Communications. (Gov't Ex. 1a.) The application sought

permission to intercept communications over a telephone number registered to Emily Meddling and

believed by the Government to be utilized by Defendant Garcia. *Id.* The application stated that

"normal investigative procedures have been tried and failed, reasonably appear to be unlikely to

succeed if tried, or are too dangerous to employ . . . ." *Id.* An affidavit from Special Agent Jayme

---

[1] Government Exhibit 1a is a copy of an "Application for Interception of Wire Communications" and Supporting
Affidavit dated April 26, 2010; Government Exhibit 1b is a copy of an "Order Authorizing the Interception of Wire
Communications" dated April 26, 2010; Government Exhibit 1c is a copy of an "Order to Service Provider" dated
April 26, 2010; Government Exhibit 2a is a copy of an "Application for Continued Interception of Wire
Communications" and Supporting Affidavit dated May 27, 2010; Government Exhibit 2b is a copy of an "Order
Authorizing the Continued Interception of Wire Communications" dated May 27, 2010; Government Exhibit 2c is a
copy of an "Order to Service Provider" dated May 27, 2010; Government Exhibit 4 is a copy of a "Sealing
Application" dated June 18, 2010 and a "Sealing Order" dated June 18, 2010; Government Exhibit 5 is a "Search and
Seizure Warrant," "Application for a Search Warrant" and Supporting Affidavit for an address on Eaglewood Drive
in Deerwood, Mi nnesota dated October 8, 2010; Government Exhibit 6 is a "Search and Seizure Warrant,"
"Application for a Search Warrant" and Supporting Affidavit for an address on Sail Away in Garrison, Minnesota
dated October 8, 2010; Government Exhibit 7 is a "Search and Seizure Warrant," "Application for a Search
Warrant" and Supporting Affidavit for an address on 240th Lane in Aitkin, Minnesota dated October 8, 2010;
Government Exhibit 8 is a "Search Warrant," "Receipt, Inventory and Return," and "Application for Search Warrant
and Supporting Affidavit" for an address  on Eaglewood Drive in Deerwood, Minnesota dated July 31, 2008;
Government Exhibit 9 is a CD recording of an interview with Karl Pentz labeled "Item 36 Copy;" Government
Exhibit 10 is a Transcript of an interview with Karl Pentz; Government Exhibit 11 is a Traffic Stop Video dated June
24, 2010.

Syversen supported the application. (Syverson Aff., Gov't Ex. 1.)

Special Agent Syversen stated that the investigation into Defendant Garcia and his organization for possession of illegal firearms and distribution of crystal methamphetamine, powder cocaine, prescription medication and marijuana began in July of 2007. (Syverson Aff., Gov't Ex. 1a, ¶ 18.) The investigation was originally commenced based on the information of confidential sources. *Id.*

Special Agent Syversen described in his affidavit the traditional law enforcement techniques employed prior to filing the application for electronic surveillance. Special Agent Syversen stated that while traditional law enforcement techniques had "provided some details and corroborative information regarding this criminal organization and its members," they had not provided information sufficient to uncover the full scope of the conspiracy. (Id. at ¶¶ 74-75.)

Three confidential reliable informants ("CRIs") provided information to agents about Defendant Garcia's trafficking of illegal drugs. (Syversen Aff., Gov't Ex. 1a, ¶¶ 20-65.) Additionally, CRI#3 engaged in seven controlled purchases of illegal drugs from Defendant Garcia between August 7, 2009 and March 17, 2010. (Id. at ¶¶ 38-65.) Agent Syversen stated in his affidavit that information from these three CRIs had not allowed agents to determine the "inner-workings of the organization" and specifically had not allowed agents to identify Defendant Garcia's drug suppliers. (Id. at ¶ 75.) Further, Agent Syversen stated that some of the CRIs had advised agents that they were reluctant to testify because they feared retaliation in the form of physical violence against them and their families. (Id. at ¶ 75.)

On September 15, 2009, State Court Judge Earl E. Maus authorized the installation of a pen register and trap and trace device on the telephone number that was the target of the application for

interception of wire communications. (Id. at ¶ 68.) The pen register was then twice extended. The pen register and trap and trace device revealed that Defendant Garcia made and received numerous calls to and from various individuals known or suspected to have involvement in narcotics trafficking. (*See* Id. at ¶¶ 68-73.) Special Agent Syversen stated in his affidavit that while the pen register results indicated a significant pattern of calls among potential members of the conspiracy, these results would be insufficient to support a prosecution because they did not identify the individuals making the calls or the content of the conversations. (Id. at ¶ 87.)

Special Agent Syversen stated that agents had conducted physical surveillance, conducted one trash search, and reviewed financial records, but that these methods had yielded limited success. (Id. at. ¶¶ 79-84, 88, 92.) Special Agent Syversen stated that the introduction of an undercover officer to Defendant Garcia had been attempted without success. He believed that the use of undercover officers would not be effective given Defendant Garcia's suspicion of new individuals. (Id. at 78.) Finally, Special Agent Syversen stated that search warrants and grand jury subpoenas were likely to alert Defendant Garcia to the scope of the investigation and were unlikely to provide information regarding the scope of the conspiracy. (Id. at ¶¶ 85-86, 89-90.)

District Court Judge Ann D. Montgomery authorized the interception of wire communications on April 26, 2010. (Gov't Ex. 1b.) On May 27, 2010 Chief Judge Michael J. Davis authorized the continued interception of wire communications. (Gov't Ex. 2b.)

**B.      Search Warrants**

### 1.      2008 Search Warrant for Defendant Pentz' Residence on Eaglewood Drive

Narcotics Agent Thomas Bergs requested the 2008 search warrant for a residence on Eaglewood Drive and served as the affiant for the application. (Gov't Ex. 8.) The search warrant

application recites the following events in support of the issuance of a search warrant for the residence.

Agent Bergs received information on July 30, 2008, from the Itasca County Sheriff's Department that a confidential informant ("CI") "had made arrangements to purchase a quantity of methamphetamine in Grand Rapids, MN from an Emily Louis Blahnik . . . and a male known as 'Mike.'" (Gov't Ex. 8.) This CI had arranged the transaction through numerous telephone contacts with "Mike." *Id.* Agent Bergs states in the affidavit that he is familiar with Emily Blahnik and knows that she resides with Defendant Pentz at the residence on Eaglewood Drive. Her drivers license listed the address on Eaglewood Drive as of April 2008. Agent Bergs received information from "a CI and other individuals" in April and May of 2008 that Defendant Pentz was dealing "large quantities of methamphetamine from his residence."

Agent Bergs states that based on "prior information" he and assisting agents had conducted surveillance on the residence and had observed "multiple vehicles coming and going from the residence." Agents observed a male entering "at least two vehicles located on the property using a flashlight." Officer Bergs states that he is aware narcotics traffickers "use vehicles or other devices to conceal narcotics and or currency."

On July 31, 2008, at approximately 12:01 a.m., agents observed a male and a female leave from the residence on Eaglewood Drive in a vehicle with license plate MN TMY767. Agents followed the vehicle to Aikin, Minnesota, where the vehicle continued on toward Itasca County at 12:22 a.m. At 1:32 a.m., Agent Bergs learned from the Itasca County Sheriff's Department that a Mickael James Calkins and Emily Blahnik arrived in Grand Rapids, Minnesota in a vehicle with license plate MN TMY767. Calkins and Blahnik then completed a methamphetamine transaction

with a CI.

Agent Bergs also requests the warrant be issued for a nighttime search to prevent the loss, destruction, or removal of objects of the search. He states that the only people living at the residence on Eaglewood Drive, Emily Blahnik and Defendant Pentz, are both currently in custody.

Based upon the foregoing, State District Court Judge John R. Leitner signed the search warrant on July 31, 2008 (Govt. Ex. 8.) The search warrant receipt, inventory and return indicates that fifteen firearms were recovered from the residence. *Id.*

### 2. 2010 Search Warrants

Special Agent Jayme Syversen requested the 2010 search warrants for a residence on Eaglewood Drive (Govt. Ex. 5), a residence on Sail Away (Gov't Ex. 6), and a commercial building on 240th Lane (Gov't Ex. 7). Special Agent Syversen served as the affiant for each application.

### a. Search Warrant for Defendant Pentz' Residence on Eaglewood Drive

The October 8, 2010 search warrant application for an address on Eaglewood Drive recites the following events in support of the issuance of a search warrant for the residence. (Gov't Ex. 5.)

"On or about July 31, 2008, law enforcement conducted a controlled purchase of methamphetamine from Pentz utilizing a CI."[2] (Syversen Aff., Gov't Ex. 5 ¶ 24.) Law enforcement determined based on CI's and intercepted communications that Defendant Pentz resides at the address on Eaglewood Drive for which the search warrant was sought. *Id.* After the controlled buy,

_____

[2]At the hearing, Special Agent Syversen testified that the statement in paragraph 24 of the search warrant application, that Karl Pentz was involved in a controlled buy on July 31, 2008, was a mistake. Special Agent Syversen stated that this controlled buy was with a man named Mike who left from Defendant Pentz' residence to meet the CI and complete the controlled buy. Special Agent Syversen acknowledged that Defendant Pentz was incarcerated on unrelated charges at the time of the July 31, 2008 controlled buy.

law enforcement executed a search warrant for Defendant Pentz' residence which recovered fifteen firearms. *Id.*

Law enforcement successfully conducted controlled buys of methamphetamine from Defendant Pentz at his residence on Eaglewood Drive on January 11, 2010 and February 9, 2010. (Id. at ¶ 25.) A confidential informant purchased 13 grams of methamphetamine on January 11, 2010 and 3.5 grams of methamphetamine on February 9, 2010. *Id.*

On September 30, 2010, law enforcement attempted to set up a controlled purchase of methamphetamine from Defendant Pentz utilizing a CI. Defendant Pentz informed the CI that "he would contact his source of methamphetamine to arrange the purchase." (Id. at 26.) On October 1, 2010, law enforcement again attempted a controlled purchase from Defendant Pentz using a CI. The CI went to Pentz' residence on Eaglewood Drive where, in a recorded conversation, Defendant Pentz told him that "he would have some methamphetamine to sell in approximately five hours." (Id. at 27.)

Based upon the foregoing, Magistrate Judge Jeffrey Keyes signed the search warrant on October 8, 2010. (Govt. Ex. 5.)

### b. Search Warrant for Defendant Garcia's Residence on Sail Away

The search warrant application for an address on Sail Away recites the following events in support of the issuance of a search warrant for the residence. (Gov't Ex. 6.)

Defendant Garcia resides at the address on Sail Away. A confidential informant informed Special Agent Syversen that this was Defendant Garcia's address, and this was corroborated by extensive law enforcement surveillance. (Syversen Aff, Gov't Ex 6 ¶ 13.) On May 20, 2010, a CI contacted Defendant Pentz to arrange a controlled purchase of methamphetamine. (Id. at ¶ 14.)

Defendant Pentz informed the CI that he had to "contact his source of methamphetamine in order to complete the purchase." *Id.* Law enforcement then observed Defendant Pentz arrive at the residence on Sail Away approximately 40 minutes after the conversation with the CI. *Id.* Then, approximately an hour and a half later, surveillance observed Defendant Pentz "arrive and meet with the CI where the methamphetamine purchase took place." *Id.*

On August 2, 2010, law enforcement conducted a controlled purchase of methamphetamine from Defendant Garcia using a CI. (Id. at ¶ 15.) Defendant Garcia instructed the CI to travel to his residence, the address on Sail Away, and retrieve some methamphetamine from a fish cleaning house on the property. The CI found the fish cleaning house, located "in the back of the house, on Defendant Garcia's property," and found and recovered the suspected methamphetamine. *Id.*

On October 4, 2010, law enforcement conducted a controlled purchase of 3.5 grams of methamphetamine from Defendant Garcia using a CI. (Id. at ¶ 16.)

Based upon the foregoing, Magistrate Judge Jeffrey Keyes signed the search warrant on October 8, 2010. (Govt. Ex. 6.)

### c. Search Warrant for Defendant Garcia's Business on 240th Lane

The search warrant application for an address on 240th Lane recites the following events in support of the issuance of a search warrant for the commercial building. (Gov't Ex. 7.)

CI's provided information that Defendant Garcia owns a business at the address on 240th Lane named DJ Truck Sales, sometimes called Curly's Towing. (Syversen Aff, Gov't Ex. 7 ¶ 18.) CI's, confidential sources, and intercepted communications indicate that Defendant Garcia utilizes this location to sell illegal drugs. *Id.* Between August 7, 2009 and May 3, 2010, law enforcement, through a CI, conducted four separate controlled purchases of methamphetamine from Defendant

Garcia at the address on 240th Lane.  (Id. at ¶ 19.)  On August 9, 2009, law enforcement conducted a controlled purchase of methamphetamine from Defendant Pentz using a CI.  After the controlled purchase, law enforcement followed Defendant Pentz directly to DJ Truck Sales, located at the address on 240th Lane.  (Id. at 20.)

Law enforcement discovered Defendant Garcia's source of illegal drugs to be Defendant Manzanares, and on several occasions surveillance observed Defendant Garcia and Defendant Manzanares meeting at the address on 240th Lane.  (Id. at ¶ 21.)  Through intercepted communications, CI's, and surveillance, law enforcement learned that Randy Motzko lived at the address on 240th Lane and worked for Defendant Garcia as a drug courier, caretaker, and employee. *Id.*  On June 24, 2010, law enforcement seized approximately 460 grams of methamphetamine from a vehicle driven by Randy Motzco.  *Id.*  After this seizure on June 24, 2010, surveillance observed Defendant Manzanares, identified as Defendant Garcia's source of drugs, arrive at the address on 240th Lane to meet with Defendant Garcia.  *Id.*

Based upon the foregoing, Magistrate Judge Jeffrey Keyes signed the search warrant on October 8, 2010.  (Govt. Ex. 6.)

## C.    Testimony

### 1.    Special Agent Syversen

At the hearing, Special Agent Jayme Syversen of the Bureau of Alcohol, Tobacco, Firearms and Explosives testified that he is one of the case agents for the criminal investigation involving Defendants.  Special Agent Syversen was the affiant on the April 26, 2010 application for electronic surveillance and on the May 27, 2010 application for continued electronic surveillance.  (Gov't Exs. 1a, 2a.)  Special Agent Syversen testified that on April 26, 2010 a meeting was held at which all law

enforcement officers who would be involved in monitoring the wire tap received both written and oral instructions regarding minimization. A minimization memo was provided at this meeting. (Gov't Ex. 3.) Additionally, Assistant United States Attorney Chris Wilton gave oral instructions and answered questions regarding minimization. Special Agent Syversen testified that based on his review, out of roughly 4,300 intercepted calls, only three were not correctly minimized. Special Agent Syversen testified that both the original wiretap and the continuation were necessary because agents had been unable to identify the full scope of the conspiracy, the identity of all co-conspirators, and the source of the drugs. Special Agent Syversen testified that the continuation of the wiretap was necessary because at that time agents had only identified one source of Defendant Garcia's drugs, Defendant Manzanares. Special Agent Syversen believed that Defendant Garcia had multiple sources. He testified that this belief was based on intercepted conversations, which revealed that Defendant Garcia was not receiving drugs from Defendant Manzanares at a time when CI's were still able to complete controlled buys of drugs from Defendant Garcia.

Special Agent Syversen was also the affiant on the federal search warrants for Defendant Garcia's residence and business and Defendant Pentz' residence, all executed on December 14, 2010. (Gov't Exs. 5-7.) Special Agent Syversen testified that paragraph 24 of the affidavit in support of a search warrant for Defendant Pentz' residence was incorrect in that it stated Defendant Pentz was involved in a controlled buy on July 31, 2010. On that date, Defendant Pentz was incarcerated. Agent Syversen testified that it was not his intention to mislead the judge, but rather this paragraph was a mistake. The paragraph should have stated that a controlled buy from a man named "Mike" and involving Defendant Pentz' residence occurred on July 31, 2010.

Special Agent Syversen also testified regarding the June 24, 2010 traffic stop of Defendant

Motzko. Special Agent Syversen testified that based on conversations intercepted through the wiretap, agents had identified a pattern that after Defendant Garcia spoke on the phone to Defendant Manzanares, Defendant Motzko typically traveled to the Twin Cities to pick up drugs from Defendant Manzanares. Special Agent Syversen believed, based on the pattern and conversations intercepted on the wiretap, that on June 24, 2010, Defendant Motzko would transport drugs from the Twin Cities to the Brainerd area. According to Special Agent Syversen, another agent told a Crow Wing County Sheriff's Department Deputy to conduct a traffic stop of Defendant Motzko's vehicle on that date.

### 2. Deputy Patrick Pickar

At the hearing, Crow Wing County Sheriff's Department Deputy Patrick Pickar testified that he conducted a traffic stop of a vehicle driven by Defendant Motzko on June 24, 2010. On that date, Deputy Pickar was contacted by Derek Lavoy, also of the Crow Wing County Sheriff's Department, who informed him that a suspect in a drug investigation was believed to be transporting narcotics from the Twin Cities. Officer Lavoy identified the suspect as Defendant Motzko and provided a description of the truck he was driving including the license plate number. Officer Lavoy advised Deputy Pickar that Defendant Motzko was driving northbound on Highway 169. Deputy Pickar testified that Officer Lavoy asked him to stop the vehicle if he observed a traffic violation.

Deputy Pickar was advised by other officers over the radio that they had observed Defendant Motzko speeding and crossing over the fog line. Deputy Pickar then drove south on Highway 169 where he passed Defendant Motzko driving northbound. Deputy Pickar observed Defendant Motzko pass on the right a car that was stopped waiting to make a left turn. Deputy Pickar testified that he also observed Defendant Motzko tailgating.

Deputy Pickar then performed a U-turn and stopped Defendant Motzko's truck. When Deputy Pickar asked Defendant Motzko for his license and proof of insurance, Defendant Motzko provided his license but stated he that did not have proof of insurance. He told Deputy Pickar that he had just picked the truck up in the Twin Cities and was driving it to a car lot. He identified the owner of the car lot and the truck as a man named "Scott." Deputy Pickar spoke to "Scott" on the phone, and "Scott" informed him that there was no insurance on the truck. Deputy Pickar testified that he then issed Defendant Motzko a citation for driving without insurance and informed him that they would have to tow the vehicle. Deputy Pickar testified that it is Sheriff's Department policy to always tow a vehicle that is verified to be uninsured. He also testified that it is standard procedure to do an inventory of the contents of any vehicle that is towed in order to ensure officer safety and to account for everything in the vehicle.

Deputy Pickar also asked Defendant Motzko for permission to search the vehicle. Defendant Motzko gave his consent to search the vehicle. The interaction between Deputy Pickar and Defendant Motzko was recorded by the dashboard camera in Deputy Pickar's squad car. (Gov't Ex. 11.) Deputy Pickar did not arrest Defendant Motzko and the video from the dashboard camera shows that at the end of their interaction Defendant Motzko walked away down the highway. (Gov't Ex. 11.)

### 3.    Special Agent Jeremy Leese

At the hearing, Special Agent Leese of the Bureau of Criminal Apprehension ("BCA") testified that he assisted in executing a search warrant for an address on Eaglewood Drive on July 31, 2008. (Gov't Ex. 8.) Local task force agents had received information from the Itasca County Sheriff's Office that a CI had been in phone contact with a Michael Calkins to arrange for a

methamphetamine transaction. The CI also informed the Sheriff's Office that Mr. Calkins would be accompanied by a woman named Emily. The informant did not know Emily's last name, but knew she was Karl Pentz' girlfriend. The local task force knew based on that information who Emily was, and that she lived at the address on Eaglewood Drive based on her driver's license.

Special Agent Leese testified that surveillance was established on the residence. Agent Visser saw a male with a flashlight moving around near a vehicle with the hood up at the residence on Eaglewood Drive. He then saw "a female join up with that male outside." At approximately midnight the male and female entered the vehicle. Special Agent Leese and other agents followed the vehicle. The vehicle was a convertible with the top down and Special Agent Leese observed a female driver and a male passenger. Their surveillance of the car ceased around 12:22 a.m. near the city of Aikin, MN.

Special Agent Leese and the other agents were later notified by the Itasca County Sheriff's Department that Mr. Calkins and Emily Blahnik had been placed under arrest after engaging in a controlled buy with the CI in Grand Rapids, Minnesota. After they were arrested, the vehicle and their persons were searched and a quantity of methamphetamine was found. The call from the Itasca County Sheriff's Department was received around an hour and a half after surveillance by Special Agent Leese had ceased. Emily Blahnik was known to the task force to be living at the address on Eaglewood Drive and to be Defendant Pentz' girlfriend.

After receiving this information, a state search warrant was drafted for the residence on Eaglewood Drive. (Gov't Ex. 8.) Special Agent Leese testified that he believed surveillance was maintained on the residence while the search warrant was being drafted. At 3:30 a.m., Special Agent Leese was notified that the search warrant had been signed. The affiant on the search warrant

was Special Agent Bergs, who then returned to assist other officers in executing the search warrant. When the search warrant was executed, agents located narcotics and firearms inside the residence. There was no one home at the residence at the time the search warrant was executed.

On cross examination, Special Agent Leese testified that Michael Calkins was the person from whom the CI purchased the drugs during the controlled buy. Mr. Calkins did not live at the residence on Eaglewood Drive. Law enforcement did not apply for a search warrant for Mr. Calkin's house.

Special Agent Leese also testified that on July 31, 2008 he knew Defendant Pentz was not home because he was incarcerated in the Itasca County Jail.

Special Agent Leese testified that on August 12, 2008, he returned to the residence on Eaglewood Drive accompanied by Sergeant Meyers . He returned in order to interview Defendant Pentz about the firearms that had been found at the residence and to execute a state search warrant to take ink finger print impressions as well as a DNA buccal swab. This interview was recorded. (*See* Gov't Exs. 9, 10.) The interview lasted less than an hour and took place in the living room of the residence. Special Agent Leese testified that neither he nor Sergeant Meyers was in uniform. He was wearing his gun and could not remember whether it was showing, but testified that it is typically covered by his sweatshirt.

When he arrived, Special Agent Leese identified himself as working for the state crime bureau and asked Defendant Pentz if he could come inside. Defendant Pentz allowed Special Agent Leese and Sargeant Meyers to come inside. They told Defendant Pentz that he was not under arrest and that it was not their intention in coming to the house to arrest him. Special Agent Leese testified, and the interview transcripts confirm, that the officers asked Defendant Pentz several

questions about the firearms found during the search prior to telling him that he was not under arrest. The officers did not search Defendant Pentz or the residence. Defendant Pentz never indicated that he wished the officers to leave or that he wished to stop speaking to them. At no time did Defendant Pentz ask for a lawyer. At no time did the officers restrict Defendant Pentz' movement around his house.

"Near the end" of the interview the officers informed Defendant Pentz that they had a warrant for finger prints and buccal swabs. They were able to execute those warrants. At the end of the interview, Special Agent Leese told Defendant Pentz that if he and his girlfriend, "after speaking with their defense attorney, they were interested in working on behalf of law enforcement, to contact Officer Meyers." Defendant Pentz was not arrested at the end of the interview.

## II.    CONCLUSIONS OF LAW

**A.    Law Enforcement  Sufficiently Attempted Normal Investigative Procedures Prior to the Application for Electronic Surveillance.**

Defendants Manzanares, Garcia, and Pentz have moved to suppress evidence obtained as the result of a wiretap in which their conversations were intercepted. The Defendants argue that the Government's application and affidavit did not demonstrate a necessity to use electronic surveillance as required by 18 U.S.C. § 2518(3)(c). The Defendants contend that the Government failed to prove the inadequacy of traditional law enforcement tactics.

18 U.S.C. § 2518(3) allows a judge to enter an order allowing a wiretap when:

> (a) there is probable cause for belief that an individual is committing,
> has committed, or is about to commit a particular offense enumerated
> in section § 2516;
> (b) there is probable cause for belief that particular communications
> concerning that offense will be obtained through such interception;

(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous; and

(d) . . . there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. § 2518(3)(a)-(d).  Subsection (c) is generally referred to as the necessity requirement, and it demands that normal investigative procedures be utilized first.  *United States v. Barnes*, 47 F.3d 963, 965 (8th Cir. 1995); *United States v. Davis*, 882 F.2d 1334, 1343-44 (8th Cir. 1989).  However, the government does not need to exhaust all possible techniques before applying for a wiretap.  *Barnes*, 47 F.3d at 965.  Section 2518(3)(c) is designed to ensure that wiretapping is not to be routinely employed as the initial step in a criminal investigation and to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.  *See United States v. Losing*, 560 F.2d 906, 910 (8th Cir. 1977).  The government's showing must be tested in a practical and commonsense fashion.  *See United States v. Daly*, 535 F.2d 434, 438 (8th Cir. 1976).  Thus, if the judge determines on the basis of the facts submitted by the applicant that normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed or to be too dangerous, then an authorization order may be granted.  *See United States v. O'Connell*, 841 F.2d 1408, 1414 (8th Cir. 1988).  A judicial determination of necessity for the wiretap is a factual determination and reviewed for clear error.  *United States v. Johnson*, 345 F.3d 638, 644 (8th Cir. 2003).

Under Eighth Circuit case law, if "law enforcement officers are able to establish that conventional investigatory techniques have not been successful in exposing the full extent of the

conspiracy and the identity of each coconspirator, the necessity requirement is satisfied." *United States v. Jackson*, 345 F.3d 638, 644 (8th Cir. 2003). In *Davis*, the court found that the affidavit and application established a necessity for the wiretap when the application explained that traditional investigative techniques had failed to provide needed information or were unlikely to succeed because of: the difficulty of placing undercover agents into the conspiracy, the ineffectiveness of physical surveillance, the surreptitious conduct of the coconspirators, the danger posed to confidential informants, and the limited utility of toll records and pen registers. *See Davis*, 882 F.2d at 1344. Similarly, in *O'Connell*, the Judge determined the wiretap was necessary under § 2518(3)(c) because it was nearly impossible for the government to discover the full scope of the conspiracy and identities of all of the participants without the use of wiretaps. *See O'Connell*, 841 F.2d at 1414. Informants were unwilling to testify and new informants could not be recruited because the organization only did business with people they had known for some time. *See id.* Although the government had collected a great deal of evidence prior to the wiretap, that evidence revealed a "large and far-flung conspiracy." *Id.* at 1415. Thus, even though the investigation had produced some evidence, the court determined that a wiretap was necessary to fully establish the entire conspiracy. Similarly, in *United States v. Thompson*, 210 F.3d 855, 858-50 (8th Cir. 2000), the court held that the affidavit is sufficient if it showed that the investigators attempted other investigative techniques but those techniques did not sufficiently reveal the full extent of the conspiracy or identify everyone involved. *See id.*

The Court finds that Special Agent Syversen's affidavit satisfies the requirements of § 2518(3)(c). Law enforcement used several traditional investigative techniques to investigate the drug conspiracy. Law enforcement obtained information from three confidential reliable informants

and used a confidential informant to conduct seven controlled buys of drugs from Defendant Garcia. While these sources provided evidence against Defendant Garcia himself and some details regarding other members of the  criminal organization, Special Agent Syversen stated that it was "not sufficiently specific as to the conduct, participation, and scope of the conspiracy to obtain an indictment or conviction of the co-conspirators."  (Syversen Aff., Gov't Ex. 1a ¶ 75.)  Some of the confidential informants advised agents that they were reluctant to testify about the information they had provided to the investigation for fear of physical retaliation.  (Id. at ¶ 75.)  Law enforcement also used pen registers to determine possible participants in the conspiracy, but that information was not sufficient understand the full scope of the operation or identify Defendant Garcia's suppliers.  (Id. at ¶ 87.)  Special Agent Syversen also details the reasons that the use of undercover officers, search warrants, or grand jury subpoenas would not be feasible or would not provide information regarding the full scope of the conspiracy.  (Id. at ¶¶ 78, 85-86, 89-90.)  Thus, the affidavit establishes that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. 2518(3)(c).  Defendant Manzanares' Motion to Suppress Evidence of Electronic Surveillance and Wiretapping (ECF No. 51), Defendant Garcia's Motion to Suppress the Contents of Any Intercepted Wire or Oral Communications and Derivative Evidence (ECF No. 100), and Defendant Pentz' Motion to Suppress Government Interception of Wire or Oral Communications (ECF No. 84) must all be denied.

**B.**    **Search Warrants**

**1.**    **Probable Cause Standard for Issuance of Search Warrants**

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the

persons or things to be seized." U.S. Const. amend. IV. Under well-established Fourth Amendment jurisprudence, a valid search warrant must be supported by an affidavit providing the signing judge with a substantial basis for determining the existence of probable cause to believe a search would uncover evidence of wrongdoing. *Illinois v. Gates*, 462 U.S. 213, 236-39 (1983). Probable cause is defined as a "fair probability that contraband or evidence of a crime will be found in a particular place." *See id.* at 238. A supporting affidavit that consists of bare conclusions or conclusory allegations cannot support a finding of probable cause. *Id.* Veracity, reliability, and basis of knowledge are "highly relevant" in determining whether a supporting affidavit establishes probable cause. *Alabama v. White*, 496 U.S. 325, 328 (1990).

Still, because "reasonable minds" may differ as to whether a particular affidavit establishes probable cause, the Supreme Court has established a "good faith" exception to the warrant requirement, according great deference to a magistrate (or signing judge's) probable cause determination. *See United States v. Leon*, 468 U.S. 897, 914 (1984) (citing *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). The *Leon* Court established that reliable physical evidence seized by officers reasonably relying on a warrant issued by a detached and neutral magistrate should be admissible in the prosecution's case in chief. *Leon*, 468 U.S. at 913. On the contrary, if a warrant is based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," the *Leon* good faith exception to the warrant requirement does not apply. *Id.* at 922-23.

Additionally, whether probable cause exists depends on the totality of the circumstances. *See Gates*, 462 U.S. at 238; *United States v. Gabrio*, 295 F.3d 880, 882-83 (8th Cir. 2002). In evaluating the existence of probable cause, courts do not consider each piece of information

independently, but instead consider the cumulative meaning of all facts taken together. *See United States v. Allen*, 297 F.3d 790, 794 (8th Cir. 2002).

   2.    **The search warrant for Defendant Garcia's residence on Sail Away was supported by probable cause.**

Defendant Garcia argues that the search warrant affidavit failed to establish probable cause to search his residence.

The Court concludes that, given the totality of the circumstances described in the affidavit in support of the search warrant, a reasonable person could believe there was a fair probability that contraband or other evidence of narcotics trafficking would be found at Defendant Garcia's residence. Specifically, the warrant application describes a controlled purchase of methamphetamine from Karl Pentz on May 20, 2010. Pentz informed the CI that he "had to contact his source of methamphetamine in order to complete the purchase." Surveillance then observed Pentz arrive at Garcia's residence on Sail Away before meeting the CI and completing the methamphetamine sale. Additionally, on August 2, 2010, law enforcement conducted a controlled purchase of methamphetamine from Defendant Garcia himself using a CI. On that occasion, Defendant Garcia instructed the CI to go to his residence on Sail Away and retrieve methamphetamine from a fish cleaning house on the property, which the CI did. Finally, on October 4, 2010, four days before applying for the search warrant, law enforcement conducted a controlled purchase of 3.5 grams of methamphetamine from Defendant Garcia utilizing a CI. This information taken cumulatively provided probable cause for the search warrant for Defendant Garcia's residence on Sail Away.

Even if this Court were to determine that the application in support of the search warrant did not provide probable cause for the issuance of a search warrant on the residence, the search would

still be valid based on the *Leon* good faith exception.  The officers who executed the search warrant

on the residence did so in the good faith belief that the search warrant was supported by probable

cause, as it had been issued by a district court judge who determined that probable cause existed.

The good-faith exception to the exclusionary rule provides that evidence will not be excluded where

police officers reasonably rely on a search warrant issued by a neutral judicial officer, even if that

search warrant is later declared invalid.  *See United States v. Leon*, 468 U.S. at 925-26.  Defendant

Garcia has not alleged or provided any evidence that the officers executing the search warrant did

not do so in good faith, therefore even if the Court were to find the affidavit lacked probable cause,

all evidence obtained would be admissible under the *Leon* exception to the exclusionary rule.  With

regard to the search of his residence, Defendant Garcia's Motion to Suppress Evidence Obtained as

a Result of Search and Seizure (ECF No. 72) must be denied.

### 3. The search warrant for Defendant Garcia's place of business on 240th Lane was supported by probable cause.

The Court also finds that the facts contained in the application for a search warrant for

Defendant Garcia's business at 240th Lane provide probable cause that drugs or other evidence of

crime would be found at that address.  Between August 7, 2009 and May 3, 2001, law enforcement,

through a CI, conducted four separate purchases of methamphetamine from Defendant Garcia at the

address on 240th Lane.  Additionally, the affidavit states that through the wiretap law enforcement

identified Defendant Manzanares as a source of Defendant Garcia's drugs, and that on several

occasions surveillance observed Defendants Garcia and Manzanares meeting at the address on 240th

Lane.  Finally, law enforcement determined through intercepted communications, CI's, and

surveillance that Defendant Motzko lived at the address on 240th Lane and worked for Defendant

Garcia.  On June 24, 2010, law enforcement seized approximately 460 grams of methamphetamine

from a vehicle driven by Defendant Motzko.  After this seizure, law enforcement observed Defendant Manzanares arrive at the address on 240th Lane to meet with Defendant Garcia.  The Court finds that these facts, taken together, are sufficient to establish probable cause that drugs or other evidence of crime would be found at the address on 240th Lane.

Even if this Court were to determine that the application in support of the search warrant did not provide probable cause for the issuance of a search warrant on Defendant Garcia's business, the search would still be valid based on the *Leon* good faith exception.  The officers who executed the search warrant on the residence did so in the good faith belief that the search warrant was supported by probable cause, as it had been issued by a district court judge who determined that probable cause existed.  The good-faith exception to the exclusionary rule provides that evidence will not be excluded where police officers reasonably rely on a search warrant issued by a neutral judicial officer, even if that search warrant is later declared invalid.  *See United States v. Leon*, 468 U.S. at 925-26.  Defendant Garcia has not alleged or provided any evidence that the officers executing the search warrant did not do so in good faith, therefore even if the Court were to find the affidavit lacked probable cause, all evidence obtained would be admissible under the *Leon* exception to the exclusionary rule.  With regard to his place of business, Defendant Garcia's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. 72.) must be denied.

**4.    Defendant Pentz' challenge to the 2008 search warrant for residence his residence under *Franks v. Delaware* fails because the omitted facts were not necessary to a finding of probable cause.**

Defendant Pentz challenges the 2008 search warrant for his residence under *Franks v. Delaware*, 438 U.S. 154 (1978), arguing that there are misleading omissions of fact from the search warrant affidavit.  Defendant Pentz argues that Officer Bergs intentionally omitted from his affidavit

the fact that Defendant Pentz was incarcerated at the time of the search warrant application, and had been incarcerated for the preceding forty days.  Defendant Pentz argues that Officer Bergs' intention was to mislead the signing judge into believing that he was currently living and selling drugs from his residence at the time of the search warrant.  Defendant Pentz further contends that if the omitted facts are included, the remedy for a *Franks* violation, the affidavit is insufficient to support a finding of probable cause, and the evidence seized pursuant to the search must be suppressed.

In order to prevail on a *Franks* challenge to a search warrant, the defendant must establish: "(1) that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the affidavit; and (2) that the affidavit's remaining content is insufficient to establish probable cause."  *United States v. Reinholz*, 245 F.3d 765, 774 (8th Cir. 2001).  With regard to omissions, "the defendant must show: (1) that facts were omitted with the intent to make, or in reckless disregard of whether they make, the affidavit misleading; and (2) that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause."  *Id.*  A reckless disregard for the consequences of failure to include information may be inferred from the fact that information was omitted only if the defendant can show that the omitted information would be "clearly critical" to the finding of probable cause.  *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993).

In the present case, the fact that Defendant Pentz was incarcerated at the time the search warrant application was submitted would be "clearly critical" to the finding of probable cause if that finding was based primarily on evidence of drug dealing by Defendant Pentz.  Officer Bergs does state that he received information from a CI in April and May of 2008 that Defendant Pentz was dealing "large quantities of methamphetamine from his residence."  However, the search warrant

application relies primarily on a controlled buy of methamphetamine from Emily Blahnick, Defendant Pentz' girlfriend, who also resided at the address on Eaglewood Drive. Mere hours before the search warrant application was submitted to a judge, law enforcement observed a man and a woman leave the residence on Eaglewood Drive. Agent Bergs then learned from the Itasca County Sheriff's Department that Emily Blahnick and "Mike" arrived in the same vehicle in Grand Rapids, Minnesota, where they were involved in a sale of methamphetamine to a CI. It appears to the Court that it is this sale of methamphetamine by Emily Blahnick that provides probable cause to search the residence on Eaglewood Drive, not any connection to Defendant Pentz. Finally, Officer Bergs does state that Defendant Pentz "is currently in custody" in the portion of the affidavit requesting a nighttime search. The inclusion of this statement cuts against Defendant Pentz' argument that Officer Bergs was attempting to intentionally mislead the judge into believing that Defendant Pentz was not in custody and was currently selling drugs at his residence.

Finally, applying the second prong of *Franks*, the Court finds that even if the fact that Defendant Pentz was incarcerated at the time of the search warrant had been included in the affidavit, the affidavit still would have supported a finding of probable cause. The evidence described above in which Emily Blahnik and "Mike" left from the residence on Eaglewood Drive before selling methamphetamine to a CI, coupled with statements that law enforcement surveillance observed heavy vehicle traffic and men entering parked cars with flashlights at night at the residence on Eaglewood Drive, activity associated with narcotics trafficking, was sufficient to support probable cause for issuance of a search warrant. Defendant Pentz' motion to suppress evidence obtained as a result of the July 31, 2008 search and seizure must be denied.

5.      **The 2010 search warrant for Defendant Pentz' residence is supported by probable cause.**

### a. *Franks* Challenge

Defendant Pentz challenges the 2010 search warrant for his residence under *Franks v. Delaware* as well. As described above, to prevail on a *Franks* challenge, a defendant must establish that "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit" and that "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." *Franks*, 438 U.S. at 155-156.

In paragraph 24 of the search warrant affidavit, Special Agent Syversen stated that "on or about July 31, 2008, law enforcement conducted a controlled purchase of methamphetamine from Pentz utilizing a CI." (Gov't Ex. 5.) At the hearing Special Agent Syversen testified that this was a mistake and that he knew Defendant Pentz was incarcerated on July 31, 2008. This controlled purchase was actually made from Defendant Pentz' girlfriend and a man named "Mike." Even if this statement was included knowingly, and not as a mistake as Special Agent Syversen testified, Defendant must still establish that the affidavit's remaining content is insufficient to establish probable cause.

The Court finds that Defendant has not satisfied the second prong of his *Franks* challenge, because with the false statement set aside, the search warrant application still establishes probable cause. The affidavit establishes that law enforcement successfully conducted two controlled buys of methamphetamine from Defendant Pentz at his residence on Eaglewood Drive in January and February of 2010. (Syversen Aff., Gov't Ex. 5 ¶ 25.) Further, on October 1, 2010, law enforcement recorded a conversation in which Defendant Pentz informed a CI that he would have methamphetamine to sell in five hours. (Id. at 27.) These facts are sufficient to establish probable

cause, even without considering the false statement regarding the July 31, 2008 controlled buy.

### b. Staleness

Defendant Pentz also argues that the evidence in the search warrant is stale because no controlled buy was successfully completed within five months of the search warrant application. Controlled buys in January and February of 2010, Defendant Pentz argues, do not provide probable cause that drugs will be found at the residence in October of 2010.

"There is no bright-line test for determining when information in a warrant is stale. Instead, we must look to the particular circumstances of the case, including the nature of the crime involved." *United States v. Pruneda*, 518 F.3d 597, 604 (8th Cir. 2008). The Eighth Circuit has held that where ongoing criminal activity is suspected, the passage of time is less significant a factor. *United States v. Morrison*, 594 F.3d 626, 631 (8th Cir. 2010). " In investigations of ongoing narcotics operations, intervals of weeks or months between the last described act and the application for a warrant does not necessarily make the information stale." *Id.*

In the instant case, Defendant Pentz was under investigation for involvement in an ongoing drug conspiracy. The controlled buys in January and February of 2010 provided evidence that Defendant Pentz was involved in selling drugs out of his residence. Additionally, in a recorded conversation a mere seven days before the search warrant application, Defendant Pentz stated that he "would have some methamphetamine to sell in approximately five hours." This statement serves as evidence that Defendant Pentz' involvement in the drug conspiracy continued through the time of the application for the search warrant. The evidence in the search warrant was not stale and supports a finding of probable cause.

With regard to the 2008 search warrant for his residence, Defendant Pentz' Motion to

Suppress Search and Seizure (ECF No. 92) must be denied.

**C.      Defendant Pentz' statements to law enforcement are admissible.**

Defendant Pentz also seeks to suppress statements made to law enforcement on August 12, 2008.  Defendant Pentz appears to argue that he was in custody at the time he was interrogated by Special Agent Leese and Sergeant Meyers and that therefore any statements made without receiving a *Miranda* warning must be suppressed.

A *Miranda* warning is required only when a suspect is subjected to custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 467–68 (1966). A custodial interrogation involves "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. Interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 302 (1980).

*Thompson v. Keohane*, 516 U.S. 99, 112 (1995), provides a two part test for determining whether an interrogation occurs in custody. The court must inquire: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* at 112. The test focuses on how a "reasonable person in the subject's situation would perceive his circumstances." *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004). Still, "[a]lthough the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving of [sic] *Miranda* protection, the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with

a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotation omitted) (recognizing the validity of considering the "totality of the circumstances" in determining whether a suspect is in custody).

The Court finds that Defendant Pentz was not in custody when he spoke with Special Agent Leese and Sergeant Meyers. The interview took place in Defendant Pentz' living room and lasted less than an hour. Both officers were dressed in plain clothes. The officers informed Defendant Pentz twice that he was not under arrest. (Gov't Ex. 10.) The officers did not restrict Defendant Pentz' movement around the house. At the end of the interview Defendant Pentz was not arrested and remained at his home after the officers left. Under the totality of the circumstances, the Court finds that Defendant Pentz was not in custody and therefore was not entitled to a *Miranda* warning.

Defendant Pentz also appears to argue he was arrested by Special Agent Leese and Sergeant Meyers when they came to his home to conduct the interview. (Memorandum in Support of Suppressing the Evidence and Statements Seized in Violation of the Fourth Amendment, ECF No. 104.) He bases this argument on the fact that the officers came to his home with a warrant but did not explain that the warrant was for the collection of DNA and fingerprints and was not an arrest warrant. Defendant Pentz argues that because the officers were holding a warrant and did not explain that it was not an arrest warrant, Defendant Pentz "did not know that he was free to leave or refuse the questions of the officers." *Id.* Defendant Pentz argues that because this was an illegal arrest, all statements he made were the fruit of an illegal arrest and therefore must be suppressed.

The Court finds that Defendant Pentz was never arrested by Special Agent Leese and Sergeant Meyers on August 12, 2008. With regard to the warrants, the transcript of the interview reveals that the officers did not reveal they had warrants until late in the interview when they asked

Defendant Pentz for finger prints and buccal swabs. (Gov't Ex. 10.) This was after the officers had informed Defendant Pentz that he was not under arrest. *Id.* When the interview was complete, the officers did not arrest Defendant Pentz and left him at his home.

Because Defendant Pentz was not arrested, his statements were not the fruit of an illegal arrest. Defendant Pentz Motion to Suppress Statements Made by Defendant (ECF No. 94) must be denied.

**D.    The evidence obtained from Defendant Motzko's vehicle was found as the result of a valid traffic stop and inventory search and is therefore admissible.**

Defendant Motzko argues that evidence found as a result of the search of his vehicle subsequent to a traffic stop on June 24, 2010 must be suppressed. "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 813 (1996). In the instant case, Deputy Pickar testified that he received information that other officers had observed Defendant Motzko's vehicle speeding and crossing over the fog lines. He also testified that he himself observed Defendant Motzko pass another car on the right and tailgating. Based on his own personal observations and the information from other officers, Deputy Pickar had probable cause to conduct a traffic stop for multiple traffic violations.

With regard to the search of the vehicle, the Court finds that the search was valid under the inventory exception to the warrant requirement. The Supreme Court has held that law enforcement "may lawfully conduct a warrantless search of an impounded automobile that is designed to produce an inventory of the vehicle's contents." *United States v. Marshall*, 986 F.2d 1171, 1173 (8th Cir. 1993), citing *South Dakota v. Opperman,* 428 U.S. 364, 376 (1976). "Because the police are performing an administrative or caretaking function rather than a criminal investigatory function

when they impound an automobile," a warrant for an inventory search is not required. *Marshall*, 986 F.2d at 1174. Thus, "the central inquiry is whether the inventory search is reasonable under all the facts and circumstances of the particular case." *Id.* Under this framework, "inventory searches conducted according to standardized police procedures, which vitiate concerns of an investigatory motive or excessive discretion, are reasonable." *Id.; cf. Florida v. Wells,* 495 U.S. 1, 4 (1990) (affirming Florida Supreme Court's exclusion of marijuana found in suitcase in car trunk where the Florida Highway Patrol "had no policy whatever with respect to the opening of closed containers encountered during an inventory search").

Once Deputy Pickar determined that the vehicle Defendant Motzko was driving did not have insurance, he had the vehicle towed. Deputy Pickar testified that it is Sheriff's Department policy to always tow a vehicle that is found to be uninsured. He testified that it is also standard procedure to conduct and inventory of the contents of any vehicle that is towed in order to account for the contents of the vehicle and ensure officer safety. Because Deputy Pickar had probable cause to conduct a traffic stop, and was required to by Sheriff's Department policy to tow the vehicle and conduct an inventory once he determined that the vehicle had no insurance, Defendant Motzko's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. 97) must be denied.[3]

### III.    RECOMMENDATION

Based upon the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY**

---

[3]Defendant Motzko also filed a motion to suppress statements made "prior to, at the time of, or subsequent to his arrest." Defendant Motzko was not arrested pursuant to the traffic stop on June 24, 2010. No evidence was presented regarding any arrest of Defendant Motzko at the hearing. Therefore, Defendant's Motion to Suppress Statements, Admissions, and Answers (ECF No. 98) must be denied.

**RECOMMENDED** that Defendant Manzanares' Motion to Suppress Evidence of Electronic Surveillance and Wiretapping (ECF No. 51) be **DENIED**.

Based upon the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant Garcia's motions be **DENIED** as follows:

1.   Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. 72) should be **DENIED**.

2.   Defendant's Motion to Suppress the Contents of Any Intercepted Wire or Oral Communications and Derivative Evidence (ECF No. 100) should be **DENIED**.

Based upon the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant Pentz' motions be **DENIED** as follows:

1.   Defendant's Motion to Suppress Government Interception of Wire or Oral Communications (ECF No. 84) should be **DENIED**.

2.   Defendant's Motion to Suppress Search and Seizure (ECF No. 92) should be **DENIED**.

3.   Defendant's Motion to Suppress Statements Made by Defendant (ECF No. 94) should be **DENIED**.

Based upon the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant Motzko's motions be **DENIED** as follows:

1.   Defendant's Pretrial Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. 97) should be **DENIED**.

2.   Defendant's Pretrial Motion to Suppress Statements, Admissions, and Answers (ECF No. 98) should be **DENIED**.

DATED: January 5, 2011

s/ *Franklin L. Noel*

FRANKLIN L. NOEL
United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **January 19, 2011**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **January 19, 2011,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.